# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 28, 2011 Session

## DANIEL DECKER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 263441      Rebecca J. Stern, Judge**

---

**No. E2010-02194-CCA-R3-PC - Filed December 22, 2011**

---

The petitioner, Daniel Decker, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief. The petitioner was convicted by a jury of one count of first-degree premeditated murder and is currently serving a sentence of life without the possibility of parole. On appeal, he contends that the post-conviction court erred in denying his petition because the proof presented established that he was denied his right to the effective assistance of counsel. More specifically, the petitioner alleges that the post-conviction court erred in multiple aspects, specifically: (1) that the court held that an expert witness had the duty and burden to present her opinions more completely at trial; (2) that the court erred by admitting a letter written by the petitioner to trial counsel after the conviction; (3) that the court should have recused itself in the matter; (4) denying relief because the petitioner met his burden of proof under the *Strickland* standard to establish ineffective assistance of counsel; (5) that the court erred by not reviewing trial counsel's performance under the *Cronic* standard; and (6) that the court erred by failing to address all issues raised by the petitioner in its order denying relief. Following our review of the record, we find no error and affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Roobin Ruben Flores, Chattanooga, Tennessee, for the appellant, Daniel Decker.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Brian Finlay, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Procedural History

The facts underlying the petitioner's conviction for first degree murder, as recited on direct appeal, are as follows.

On August 9, 2001, Sergeant David Woosley of the Chattanooga Police Department was dispatched to 4113 Sunbury Avenue in response to a 911 call from the [petitioner]. During the call, the [petitioner] indicated that there had been a forced entry and assault. The [petitioner] shared the home at 4113 Sunbury with his grandmother, Judith Decker.

When Sergeant Woosley and other officers arrived at the scene, the [petitioner] was on the front porch of the home with a telephone, wearing only boxer shorts. The [petitioner] informed the officers that the suspect was gone. During the initial sweep of the home, the officers found the body of Judith Decker, the victim, in her bed. According to Sergeant Woosley, it was obvious that the victim was deceased.

As the officers continued to sweep the home, they found that one of the door windows in the kitchen area was broken. The door was standing open and was pushed up against the kitchen counter. There was glass on the counter. The [petitioner] claimed that the intruder had entered the house through the garage. There were no signs of forced entry to the door or the lock. Additionally, other than the bloody scene in the victim's bedroom, the remainder of the house was intact and very well kept.

Officer Elicia Jenkins also responded to the initial dispatch. Upon her arrival, she noticed the [petitioner] screaming and yelling in the living room. Once the [petitioner] quieted down, he asked Officer Jenkins how his grandmother died, whether she was shot and where he was going to live. The [petitioner] told the officers that he did not know what happened to his grandmother because he had not been in her bedroom. The officers did not allow the [petitioner] to put on a shirt or robe because he had scratches on his face, arms and neck and what appeared to be brain matter on his chest.

Sergeant Craig Johnson of the Crime Scene Unit documented the [petitioner's] injuries. The [petitioner] suffered superficial wounds to his arms and neck area and had blood around his nose and on his hands.

During the search of the home, the officers discovered that the washing

-2-

machine was full and had been stopped mid-cycle. Inside the washing machine, the officers discovered trousers, undershorts, a wash rag, a couple of towels and a couple of pillowcases.

The [petitioner] was subsequently taken to the police station for questioning after the police noticed his suspicious behavior and some inconsistencies at the crime scene. Once at the police station, the [petitioner] was advised of his *Miranda* rights. The [petitioner] waived his *Miranda* rights and gave a lengthy statement.

In his statement, the [petitioner] informed the police that he called 911 in order to "cover up what happened, make it look like I didn't do it." According to the [petitioner's] initial story, he and his grandmother got into an argument during which his grandmother slapped him several times. At some point during the argument, the [petitioner] claimed that he picked up a knife and starting cutting himself, even threatening to commit suicide if his grandmother kept telling him he was irresponsible. At some point during the argument, the [petitioner] picked up a broom and busted out the window.

The [petitioner] then told police that he and his grandmother started fighting on the floor. He was able to push her off of him and grab the fire poker from the fireplace. Then, according to the [petitioner], he hit his grandmother with the poker, which drew blood. FN1. Then the [petitioner] stated that the victim went to her bedroom to read. The [petitioner] initially claimed that he followed her to her bedroom then changed his story to say that the victim sent him to his room for a time before she called him into her bedroom. FN2. At some point, the [petitioner] took off his watch and ring because he "didn't want to get blood on them." The [petitioner] claimed that his grandmother "started cussing" at him and would not stop so he "kept hitting her with it [the fire poker] and then the handle broke and I picked it up and kept hitting her and then I . . . then I noticed that she was not moving and that's when I turned the lights out and called the cops." The [petitioner] told the police that he hit the victim "probably fifteen" times in the head area with the fire poker.

> FN1  The [petitioner] later claimed that he "swung at her [with the fire poker] in the living room but it did not draw blood" and that "it was in the bed that it drew blood."

> FN2  The [petitioner] changed his story again. In the next

-3-

version of the story the [petitioner] claimed that he swung at the victim with the poker but did not hit her. Then the victim ran to the bedroom and got into bed. The [petitioner] stated that he followed her into the bedroom and hit her twice with the poker. Then the [petitioner] claimed that the victim told him to go to bed. Sometime later, the victim called the [petitioner] back to her bedroom. On his way in, the [petitioner] grabbed the poker. The two started arguing again. According to the [petitioner], the victim sat up in bed and began hitting him. The [petitioner] then hit her repeatedly with the poker.

According to the [petitioner], after he realized that the victim was dead, he wiped off the fire poker, washed the blood out of a rag he used to clean it up and stuck it in the washing machine along with his clothing. The [petitioner] also admitted that he tried to clean up some of the blood that was on the carpet.

At trial in February of 2005, Dr. Frank King, the Hamilton County Medical Examiner, testified that the cause of the victim's death was severe blunt head trauma as the result of a homicide. According to Dr. King, the impacts of the blows were forceful enough to split the skin of the face and scalp and to break many of the bones in the face and skull in addition to directly injuring the brain inside the skull. The injuries were consistent with the victim being struck repeatedly with the amount of force comparable to swinging a baseball bat. Dr. King was unable to determine the exact number of blows that the victim received because the victim's skull was crushed and caved in completely. The injuries were located primarily in the center of the face and forehead and slightly to the right side of the face and forehead. In addition, there were several blunt trauma impacts to the mouth area.

Dr. King opined that the victim's injuries were consistent with there being no movement of the victim's head during the time in which the blows were inflicted. According to Dr. King if the victim was moving her head or body around while an object was being swung at her, there would be more complicated patterns of injury, and it would be expected that the victim would have impact injuries on different parts of her head or upper torso. In this case, the fact that all of the blows were concentrated to one area of the victim's face and head indicates that there was little or no movement of the victim or the victim's head during the attack. Dr. King further opined that the victim was likely to be asleep or not conscious of the attack because there was blood

spattering only on the top of the comforter and the victim's exposed left arm. Additionally, the victim had no defensive wounds to her forearms.

Mary Beth Catanzaro testified that in June of 2001, she was a juvenile court referee responsible for listening to juvenile cases and making determinations as to appropriate treatment and rehabilitation. Referee Catanzaro identified a tape-recording of a hearing in which she informed the [petitioner] that he would be committed to state custody if he did not cooperate in his home. The [petitioner] indicated that he understood if he did not behave at home he was going to be incarcerated until he was nineteen years old.

Mark Wells, a case manager for Hamilton County Juvenile Court, testified that he was appointed as a case manager for the [petitioner] in 2001 due to some behavioral problems. Mr. Wells met with the [petitioner] and the victim several times. At some point, the victim, the [petitioner] and Mr. Wells prepared a behavior contract for the [petitioner] in order to address some of the problems the [petitioner] was having regarding his behavior and his unruliness towards the victim. At the time of the victim's death, Mr. Wells was monitoring the [petitioner] several times a week.

Mr. Wells witnessed the [petitioner's] "arrogant and antagonistic" behavior toward his grandmother on July 25, 2001, when he was at the victim's home for a birthday dinner. According to Mr. Wells, the victim and the [petitioner] got into an argument about money that the [petitioner] had inherited from his grandfather. The victim told the [petitioner] that he would get the money if she felt that he was "responsible."

The [petitioner] took the stand in his own defense. He testified that in June of 2001, he was living with the victim at 4113 Sunbury Drive. The [petitioner] admitted that he was having a lot of problems with being disrespectful and entered into a written agreement that summer regarding his behavior with his grandmother and social worker.

According to the [petitioner], on August 9, 2001, he woke up about 10:30 a.m. and went to his neighbor's house. He was not feeling well, so he called his grandmother at work. The victim told the [petitioner] to have their neighbor, Mr. Martin, drive him to the hospital where she worked. The [petitioner] did not want to go to the hospital. When the victim arrived home from work, she had been unhappy with the [petitioner] for not completing any of his chores after being home all day. The [petitioner] stated that he got a

knife and cut himself on the arm, but put the knife away after the victim slapped him in the face. The [petitioner] then stated that he was angry and broke a window. According to the [petitioner], the victim hit him and followed him into the living room. While he was walking into the living room, the [petitioner] tripped and fell to the floor. The [petitioner] testified that the victim got on top of him and began hitting him. The [petitioner] put his foot into the victim's stomach and pushed her off of him. The [petitioner] then claimed that the victim got back on top of him and hit him in the nose, causing it to bleed.

The [petitioner] then admitted that he grabbed the fire poker and hit the victim twice before chasing her to the bedroom. The [petitioner] stated that he took off his watch and ring because he did not want to get blood on them. The victim told the [petitioner] to go to his room. On his way to his room, the [petitioner] took off his clothing and placed it in the washing machine. The [petitioner] then claimed that the victim called him back to her room where the victim threatened to call Mark Wells to report the [petitioner's] behavior. The [petitioner] unplugged the phone to prevent the victim from making any telephone calls.

The [petitioner] stated that he knelt down, and the victim grabbed him by his hair and slapped him. Then, the [petitioner] claimed that "voices inside of [his] head" told him to "get rid of this, just do what you have to do." At that point, the [petitioner] stated that he:

> [W]ent out into the hallway where I put the fire poker because I put it out there when I was on my way to the bedroom not intending to use it again. I went back in there without any thought or any reason. I didn't know why I went back in there and it just happened so fast. I took the fire poker and I swung it up like this and I just hit her and she was crouched down in the bed, I guess she was planning on going to sleep after I went back out in the hallway and I just kept hitting her in the same spot. I didn't move hardly at all and I just kept hitting her and hitting her. I don't know how many times I hit her really. I said fifteen in the statement but that was just a guess. I don't know how many times I actually hit her.
>
> I realized that she wasn't saying anything and I finally stopped. I turned the light on and I saw what I saw lying there

with her head beat in and not moving anywhere. I said to myself, what have I done. What I did was, I got real scared, really scared and I tried to clean everything up and even a couple of times I tried to see if I could -- even though I wasn't really thinking, I knew I couldn't do nothing but I tried to see if I could do anything with her head and move it a certain way and see if she was still living but I didn't touch it because I was scared to. I wanted to do something because I didn't know what to do. I was scared to death.

After that I went and cleaned off the fire poker. I threw the purse on the porch and I put the fire poker back on the stand. I cleaned the carpet over where I put the fire poker. I called the police and that's what happened.

The [petitioner] also admitted that he lied to the 911 operator by making up the intruder story.

The defense also called Dr. Michael Schmits, a child psychologist at Cumberland Hall who observed and tested the [petitioner] during his month-long forensic evaluation. Dr. Schmits testified that the [petitioner] was deemed competent to stand trial but had "significant clinical symptoms of psychiatric disturbance." Dr. Schmits concluded after testing that the [petitioner] suffered from psychotic disorder and conduct disorder. According to Dr. Schmits, part of the diagnosis for the psychotic disorder was based on the [petitioner's] claims that he was "hearing voices" and "seeing apparitions" or "demons."

Dr. Pamela Auble, a psychologist, also evaluated the [petitioner] prior to trial. Dr. Auble performed a "neuropsychological evaluation" of the [petitioner]. In conjunction with the evaluation, Dr. Auble spent approximately twelve hours with the [petitioner]. Dr. Auble opined that the [petitioner] suffered from psychotic disorder not otherwise specified, chronic post-traumatic stress disorder, attention deficit hyperactivity disorder, cognitive disorder not otherwise specified, and oppositional defiant disorder.

At the conclusion of the proof, the jury found the [petitioner] guilty of first degree murder. In a bifurcated sentencing hearing, the jury heard testimony regarding aggravating and mitigating factors. After hearing the testimony, the jury sentenced the [petitioner] to life in prison without the

possibility of parole.

*State v. Daniel Andrew Decker*, No. E2005-01241-CCA-R3-CD (Tenn. Crim. App., at Knoxville, June 9, 2006). The petitioner then appealed his conviction, and a panel of this court affirmed the judgment of the trial court. *Id*. No application for permission to appeal was filed with the Tennessee Supreme Court.

Thereafter, on March 30, 2007, the petitioner filed a timely *pro se* petition for post-conviction relief, asserting that he was denied his right to the effective assistance of counsel on appeal. He also asserted that trial counsel had failed to file notice of appeal with our supreme court or to inform the petitioner of his withdrawal. Following the appointment of post-conviction counsel, an amended petition was filed with the court. In September, 2008, a hearing was held before the post-conviction court and evidence was presented with regard to the issues raised in the post-conviction petition. Additionally, the post-conviction court determined that the petitioner was entitled to a delayed appeal to allow him to file for permission to appeal to the Tennessee Supreme Court. The remaining issues before the court were stayed pending the outcome of the delayed appeal.

However, post-conviction counsel, who was also representing the petitioner on delayed appeal, failed to file a timely application for permission to appeal. After the expiration of time, post-conviction counsel made an oral motion to the post-conviction court seeking to extend the time for filing the application. The post-conviction court granted the petitioner an additional sixty days to file the application. However, on May 26, 2009, the Tennessee Supreme Court dismissed the application as untimely. Thereafter, the post-conviction court took up the stayed issues from the post-conviction petition, considering the evidence which had been presented at the earlier hearing.

Multiple witnesses were called to testify at the hearing, including trial counsel, Dr. Pamela Auble, two attorneys who had represented the petitioner prior to trial counsel, and the petitioner himself. Trial counsel was the first witness called, and he testified that he had been appointed to represent the petitioner after the petitioner's original attorney's were unable to continue. According to trial counsel, he did speak briefly with those attorneys, but he did not feel that that was most important to his representation, especially in light of the fact that he did receive over two boxes of prior research and preparation prepared by previous counsels. Trial counsel indicated that he reviewed the information in the file and added to it as well based upon his own preparation. He acknowledged that the facts of the case were "horrific" and that the State had "absolutely crushing proof," as there was no real dispute that the petitioner had bludgeoned his grandmother to death.

Trial counsel testified that he rarely took appointed cases and, when he did, they were

looked at as partially *pro bono* service, thus explaining why he billed so few hours for the petitioner's representation. However, he explained that not only had he himself worked on the case, but that he had also utilized the services of his law partner and the firm's paralegal. He indicated that, although he was ultimately responsible for trial preparation, in his office, major trials such as this one were handled with a team approach. Trial counsel further indicated that he met with the petitioner numerous times and reviewed trial strategy. He stated that he felt the petitioner understood the charges against him and that he was involved in every aspect of the defense.

Trial counsel specifically indicated that he developed a "full mitigation history" regarding the petitioner. He stated that he was aware that the petitioner had a "very difficult and troubling background," essentially being abandoned by both parents at a very young age and given to the victim to raise at around two years of age. Trial counsel was also aware that the petitioner had a history of mental health issues. Trial counsel indicated that they proceeded with the defense that the petitioner lacked the capacity to premeditate the murder. In support of that, trial counsel testified that he availed himself of the resources available from the court and "got the very best people . . . to look at him and evaluate him and [do] testing on him."

Trial counsel testified that he or his team spoke with prosecution witnesses, met with the petitioner's relatives, and obtained a family history. In addition to these other witnesses, trial counsel also relied on Dr. Auble, a forensic psychologist, who prepared a report and testified at trial on the issue of diminished capacity. Trial counsel indicated that he met with Dr. Auble at least two times, as well as speaking with her on the telephone and reviewing the contents of her report. Trial counsel stated that he felt that Dr. Auble was well-prepared for trial and thought she was a good witness for the defense to mitigate the element of premeditation. In response to questioning by the petitioner's attorney regarding trial counsel's preferred method of preparing an expert to testify at trial, which he indicated he used with Dr. Auble in this case, trial counsel stated:

> [R]ead the report, which is in her words, ask her to discuss the report with me generally, and then if I have specific issues, like the ones I just outlined for you, I'll go over those. I may tell her I think that's particularly important or I may hold that back for myself. At the end of her report I ask her if there's anything in it that she wishes to change. I ask her if she feels confident with the things in the report. I talk to her about what [the State] is likely to cross-examine her on. And I go over with her things to be careful about. And from my memory I went over those things with her in person before she testified .
> . . .

Trial counsel stated that he preferred this method of "general" preparation of his expert witnesses rather than outlining question by question what would be covered in direct testimony. He stated that to do otherwise often "backfired" in his opinion. Trial counsel also testified that Dr. Auble had never expressed any displeasure to him about her testimony in the case or his method of preparing her for trial. He reiterated that, in his opinion, Dr. Auble was well-prepared and was in fact a powerful witness for the defense.

Also in response to questioning by the petitioner's attorney, trial counsel was allowed to testify with regard to a letter he received from the petitioner following his conviction and sentencing. In the letter, the petitioner admitted that he had committed the murder with premeditation, going into gross detail of how the murder was committed. Trial counsel acknowledged that during his preparation of the case, he had had concerns that the petitioner was fabricating his defense of diminished capacity. Trial counsel testified that he explained his concerns to the petitioner and informed him it was essential to tell the truth, as trial counsel would not present testimony that he knew to be untruthful.

The next witness called to testify was Dr. Auble. She testified that she was retained to evaluate the petitioner and to testify at trial. She indicated that she reviewed numerous records, interviewed the petitioner, and administered standardized tests in conducting her evaluation. The results indicated that the petitioner was competent and not insane, so she focused on the defense of diminished capacity and mitigation. She testified that her initial report was completed in January, 2005, but that trial counsel's office continued to send her additional records for review. A revised report was completed in February, 2005, which contained two individual reports. One report contained background information, interview data, a summary of the records relied on, and a summary of the test results. The other contained Dr. Auble's diagnosis and conclusions. She indicated that she continued to receive materials from trial counsel even after this report was issued, but that she did not change the report in reponse.

Dr. Auble testified that she did not discuss her report with trial counsel prior to trial and stated that she felt she was ill-prepared to testify. She testified that she was aware that the general subject of her testimony would be diminished capacity, but she said she felt trial counsel did not prepare her for any specific testimony. However, further questioning revealed that she had spoke with trial counsel or his staff on at least two to three occasions and had met with trial counsel on February 16, 2005, and generally discussed her report. She complained that trial counsel did not prepare her "in detail" regarding her testimony, however.

With regard to her dissatisfaction with her trial testimony, Dr. Auble stated that she felt she did not do an adequate job of informing the jury how the petitioner's mental disease

affected his capacity to form intent. She complained that on direct examination, trial counsel only elicited the fact of the disease, not how it affected the petitioner's ability to premeditate murder. She stated she wanted to say more to establish the link, but she was not able to just volunteer the information without trial counsel asking the questions. Dr. Auble did acknowledge that on cross-examination, she was able to specifically testify that the petitioner was not able to form the requisite intent, but she testified that she was not able to adequately explain her reasoning. She reiterated that she was not pleased with her testimony, but acknowledged that she never informed trial counsel of this fact.

Finally, Dr. Auble testified that, on the morning of the post-conviction hearing, she had been asked to review the letter written by the petitioner to trial counsel following the conviction. After reviewing the letter, she could not say for sure whether the letter would have changed her opinion as to the petitioner's mental state at the time of the murder.

The next witness to testify was Karla Gothard, an assistant public defender. She testified that because the petitioner was a juvenile at the time of the murder, initially Mike Acuff, the public defender assigned to the juvenile court, was assigned the case. She indicated that when the case was transferred to criminal court, Mr. Acuff wanted to remain on the case, and it was determined that he would remain as lead counsel, to be assisted by Ms. Gothard. Ms. Gothard testified that she became quiet familiar with the case and spoke with the petitioner on several occasions. The case was originally set for trial in 2002 or 2003, but Mr. Acuff was called to active duty in the Army Reserves. Ms. Gothard then became lead counsel and sought multiple continuance to prepare. She was eventually removed by the trial court from the case. At the petitioner's request, the removal was appealed, and the case languished in the interim. Eventually, the removal was affirmed, and attorney David Barrow was appointed.

Ms. Gothard indicated that she had done a great deal of research and investigation in the case and that she spoke in depth with Mr. Barrow, even giving him her complete file, which she asserted was very extensive. She recalled that Mr. Barrow indicated to her that he felt he was "over his head" with the case, and attorney Hank Hill was then appointed. Thereafter, Mr. Hill was removed, and trial counsel was appointed. Ms. Gothard did not specifically recall talking to trial counsel, but she acknowledged that she may have talked to him on the phone. She was also aware that he was in possession of her original file.

Based upon her knowledge of the case, Ms. Gothard opined that both experts and lay witnesses should have been utilized to establish the petitioner's long-standing mental illness. She also indicated that, in her opinion, there should have been more testimony establishing how the illness affected the petitioner's ability to form intent. She testified that she spoke with Dr. Auble on the day of trial, and noted that Dr. Auble appeared to be upset.

Attorney David Barrow was the next witness called to the stand. He indicated that he had represented the petitioner on appeal following his conviction. His testimony mainly related to the issue of the delayed appeal based upon his failure to file an application for permission to appeal to the Tennessee Supreme Court.

The last witness to testify was the petitioner himself. He indicated that he had been represented by numerous attorneys throughout the entire proceeding of the case, with the last of those being trial counsel. He estimated that he met with trial counsel on two or three occasions, and with a paralegal once or twice. The petitioner did acknowledge that trial counsel had advised him of his options, but he indicated that he did not fully understand those options at the time. He also acknowledged writing the letter to trial counsel following his conviction, but he now claimed that the letter was false. He testified that, at the time the letter was written, he was depressed and heavily medicated.

After considering the evidence, the court found that the petitioner had failed to establish that trial counsel was ineffective and denied the petition. Timely notice of appeal was filed on September 1, 2009. On appeal, the State argued that the record failed to reflect that the petitioner had knowingly and voluntarily waived his right to conflict-free counsel based upon post-conviction counsel's continued representation during the post-conviction proceedings, as well as on delayed appeal. A panel of this court concluded that the post-conviction court had a duty to conduct a hearing on the issue and remanded the case to the post-conviction court for its determination. *Daniel Decker v. State*, No. E2009-01833-CCA-R3-PC (Tenn. Crim. App., at Knoxville, July 6, 2010). On September 20, 2010, a hearing was held regarding the petitioner's right to conflict-free counsel. The petitioner executed a written waiver and stated that he wished post-conviction counsel to continue his representation. Thereafter, timely notice of appeal was again filed, and the case is now properly before this court for consideration.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred in its denial of his petition for relief. Specifically, the petitioner raises six areas of challenge: (1) that the court held that an expert witness had the duty and burden to present her opinions more completely at trial; (2) that the court erred by admitting a letter written by the petitioner to his trial counsel after the conviction; (3) that the court should have recused itself in the matter; (4) denying relief because the petitioner met his burden of proof under the *Strickland* standard; (5) that the court erred by not reviewing trial counsel's performance under the *Cronic* standard; and (6) that the court erred by failing to address all issues raised by the petitioner.

The burden in a post-conviction proceeding is on the petitioner to prove the factual allegations to support his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010); *see also Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). If the petitioner proves his grounds by clear and convincing evidence, the trial court must then determine whether trial counsel was ineffective according to *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Dellinger*, 279 S.W.3d at 293-94. On appeal, this court is bound by the post-conviction court's findings of fact unless it concludes that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Because they related to mixed questions of law and fact, this court must review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a *de novo* standard with no presumption of correctness. *Id*. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show: (1) that counsel's performance was deficient; and (2) that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id*. at 697. In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that "there is a reasonable probability" that but for the substandard performance, "the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In determining whether trial counsel's performance was deficient, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

## 1. Burden of Expert Witness

The first issue raised by the petitioner is his contention that the post-conviction court erred when it held that the expert witness in this case, Dr. Auble, had the duty and burden to present her opinions more completely at trial. According to the petitioner, it appears from its conclusions that the court "placed the blame for the lack of evidence" on Dr. Auble herself. The petitioner's argument appears to center around what he contends is the role of

the attorney versus that of the witness. He contends, rightly so, that it was trial counsel's role "to prepare the case for trial, which includes his preparation of the testimony of Auble." He also asserts that there is "nothing to suggest that Auble had a duty to submit ceratin evidence to the jury." He contends that "it is the duty of the attorney to ensure the expert is properly prepared to testify and to testify to all that is asked by the attorney. To do otherwise would eviscerate the whole purpose of a J.D. and a license to practice law." The petitioner submits that consideration of this issue is one of first impression in Tennessee.

Initially, as pointed out by the State, the petitioner has waived consideration of this argument by his failure to cite to relevant portions of the record. *See* Tenn. R. Crim. App. 10(b); Tenn. R. App. P. 27(a)(7). The petitioner's brief simply fails entirely to direct us to which portions of the record he wishes to challenge. Moreover, we discern no statements made by the post-conviction court which would support a conclusion that it in any way held Dr. Auble to supply a burden of proof. It is the duty of the petitioner to point this court to specific challenged testimony to review. As such, for this ground alone, the petitioner is entitled to no relief.

Moreover, while the petitioner frames his issue as one of placing a burden on a witness, a reading of his argument leads us to conclude that he is essentially only asserting a challenge to trial counsel's effectiveness in preparing Dr. Auble to testify at trial and examining her on the witness stand. These are simple issues of deficient performance of counsel to be considered under the *Strickland* standard. As such, the issue of trial court's preparedness for trial will be evaluated in Section 4 of this opinion under the applicable standard. We are unable to conclude anything in the petitioner's argument places an issue of first impression before this court.

## 2. Admission of Letter Written by the Petitioner After Conviction

The petitioner also asserts that it was an abuse of discretion for the post-conviction court to allow the letter written by the petitioner to trial counsel following conviction into evidence. According to the petitioner, the letter's contents, *i.e.* the petitioner's confession that he did commit the murder with premeditation, should have been excluded as character evidence.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999). However, generally, evidence of one's character is inadmissible. Tenn. R. Evid. 404(b). Nonetheless, our rules have established that if a petitioner in some way "opens the door" to such evidence, it may be admissible, as the post-conviction court found in this case.

In support of his argument, relying upon *State v. West*, 844 S.W.2d 144, 149 (Tenn. 1992), the petitioner contends that not all testimony elicited from the witness which technically "opens a door" is admissible. In his case, the petitioner argues that trial counsel was defensive in his responses and gave an unsolicited and volunteered reference to the letter to purposefully "open the door" to allow the evidence in. Finally, he contends that the court's "error was to allow the evidence without ruling *why* the letter was relevant."

The following is taken from the transcript of the hearing during the questioning of trial counsel by the petitioner's attorney:

> Q. But you understand one of the issues in this case with [the petitioner] is mental health; right?
> A. Absolutely.
> Q. And that he had a history of hearing voices.
> A. I dispute that.
> Q. You dispute that?
> A. I dispute the validity of that.
> Q. Well, [the petitioner], at the time you were aware that [the petitioner] had extensive history of mental illness, didn't you.
> A. At the time there was suggestions from [the petitioner] that he was making up what he was telling me. At the time I had some concerns about his fabricating a story in his defense. At the time there was some suspicions I had about whether his story was truthful and candid. A lot of it made no sense. And those suspicions, we you are well aware, were confirmed when he sent me a letter less than 30 days later - -
> Q. Well, Judge - -
> A. - - describing exactly what he - -
> Q. - - at this point - -
> The Court: Well, I'm going to allow the letter at this point because of this line of questioning.

As noted, the post-conviction court allowed that letter to be admitted because of this line of questioning by the petitioner's counsel. It is further noted that the petitioner objected to the admission of the letter solely on relevancy grounds prior to the beginning of the hearing. The post-conviction court, at that time, noted that it would hold the decision until further evidence was presented, but did note that it could possibly come in on a credibility issue if warranted based upon the evidence. Clearly, based upon the court's statements prior to the beginning of the hearing, in conjunction with the statement that the letter was being admitted based upon the line of questioning by the petitioner's counsel, relevancy was considered and ruled upon.

Morever, the State responds that the petitioner's reliance upon *West* is misplaced because this case is factually distinguishable. The holding in *West* stood for the proposition that the prosecution in a criminal case is not permitted to open the door to questions of an accused's propensity for violence or peacefulness under the pretense of gathering ammunition for a credibility attack. *Id*. In that case, it was the State who sought to introduce evidence of the defendant's reputation for violence and told the court that it would be used to show the defendant's violent nature and to impeach the defendant if he testified. *Id*. at 148. Thus, it was the State who asked the defendant if he considered himself a peaceful person, and the State who later called a rebuttal witness to testify contrarily to the defendant. *Id*. However, in the instant case, it was not the State who initiated the line of questioning which led to trial counsel's statements- rather it was the petitioner's own attorney. Based upon our review of the applicable record, we cannot conclude that the court abused its discretion in admitting the letter because the "door was opened" based upon statements made by trial counsel in response to questioning by the petitioner's counsel. No relief is warranted on this issue.

### 3. Recusal of Post-Conviction Court

Next, the petitioner contends that the post-conviction court erred by denying his oral request to recuse itself from the petitioner's post-conviction hearing. Any motion to recuse is addressed to the sound discretion of the trial court and will not be reversed unless "clear abuse" appears on the face of the record. *State v. Conway*, 77 S.W.3d 213, 224 (Tenn. Crim. App. 2001) (citing *Owens v. State*, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999)). The Tennessee Supreme Court has instructed that, under this standard, "[a]n appellate court should not reverse for 'abuse of discretion' a discretionary judgment of the trial court unless it affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice to the party complaining." *Marcus v. Marcus*, 993 S.W.2d 596, 601 (Tenn. 1999). Unless the evidence in the record indicates that the trial judge clearly abused his or her discretion by not disqualifying himself or herself, a reviewing court may not interfere with the decision. *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995).

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002). This court has previously noted that a trial judge should grant a motion to recuse whenever the judge "has any doubt as to her [or her] ability to preside impartially in a criminal case or whenever his [or her] impartiality can reasonably be questioned." *Pannell v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). While the first inquiry is a subjective test, the second is an objective standard. *Alley v. State*, 882 S.W.2d 810, 820-21 (Tenn. Crim. App. 1994). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's

-16-

position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Id*. at 820. "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co*., 38 S.W.3d 560, 565 (Tenn. 2001).

The petitioner bases his argument for recusal on comments made by the post-conviction court which explained the circumstances of trial counsel's appointment to the case. Initially, we note that these comments by the court appear to have been precipitated by the petitioner's attorney's questioning to trial counsel regarding a lack of hours which had been billed, followed by trial counsel's remark that the case was partly considered *pro bono* and that all the hours spent on the case were not billed. The court, at the time the trial court, stated that it had begged trial counsel to take the appointment because the court wanted the petitioner to have the best representation he could receive after the unfortunate circumstances with prior trial counsels. The following colloquy then occurred:

| | |
|---|---|
| Appellate Counsel: | Judge, is there a possibility - because [the petitioner] wanted me to raise this and I didn't think I had enough as far as maybe some bias by the Court - |
| | . . . . |
| The Court: | Bias because if he didn't do a good job I would have been more worried about that. What I'm saying is I was very concerned that [the petitioner] have a well-qualified attorney. |
| Appellate Counsel: | Yes, ma'am. |
| The Court: | And that [trial counsel] generally, with his experience, didn't take appointed cases. And I thought the record should reflect that. You know if [trial counsel] fell down on his job or something like that I would definitely - it's been my desire from the very beginning, because I felt like [the petitioner] got a raw deal up front, to make sure he got the best case he could get. So I'm more concerned - I'm very concerned for [the petitioner] and I always have been. |
| Appellate Counsel: | Very Good. |
| The Court: | So, no, if [trial counsel] fell down on the job someway [sic] I would be right on it. |
| Appellate Counsel: | Very good. But as I said, [the petitioner] wanted me to raise that and I didn't see - |
| The Court: | Well, you can tell him you raised it up here and I said, no, I'm not biased. |

| | |
|---|---|
| Appellate Counsel: | Yes, ma'am. |
| The Court: | That I've been concerned for [the petitioner's] having a fair trial from the very beginning because I felt like he got a raw deal at the beginning and sat in jail for a year. And I just thought the record ought to reflect [trial counsel] did not come looking for this in order to make money off the case. |

The petitioner's argument is that unspoken in the court's comments and concerns that the petitioner receive "the best representation possible" is the implication that trial counsel was considered by the trial court to in fact be the "best" representation possible. We completely disagree with the petitioner's thought process. As noted by the State, the comments indicate a strong concern by the court for the petitioner's rights. The court clearly indicated that it was acting to protect the petitioner. The comments made following the petitioner's motion to recuse are straight-forward and don't appear to give any credence to a bias in favor of trial counsel. The court was prepared to hold itself to the appropriate applicable standard in determining the effective assistance of counsel claim. Nor can we determine that the comments in any way rise to the level in which the court's impartiality could objectively be questioned. As such, we must discern that the court did not abuse its discretion in denying the request for recusal. Additionally, we note that at the time post-conviction counsel made the request to the court on petitioner's behalf, counsel himself appeared to be in agreement that the comments did not mandate a recusal by the court. The petitioner is entitled to no relief.

## IV. Ineffective Assistance of Counsel under the *Strickland* Standard

The petitioner next claims that the post-conviction court erred in denying his petition because the record evidence establishes that trial counsel was deficient under the *Strickland* standard. On appeal, the petitioner's main contention in this regard appears to be that trial counsel was not prepared himself for trial and that he failed to properly prepare Dr. Auble to testify regarding the petitioner's state of mind. In support of this argument for lack of preparation, the petitioner relies upon trial counsel's submitted fee claim form, arguing that trial counsel simply relied upon the work and investigation of his predecessors without ever discussing the case with them. The petitioner further claims that trial counsel's "utter failure" to properly prepare Dr. Auble to testify can not be "anything other than prejudicial," as premeditation was key to the defense theory.

In its detailed written order denying relief, the post-conviction court stated, in relevant part, as follows:

The petitioner alleges that counsel did not make a sufficient investigation of the facts, merely relying on information from his predecessor, Ms. Gothard, investigate his history or communicate with Dr. Auble enough to challenge the charge of premeditation and present evidence of mitigating circumstances, discover his parents' histories of mental instability, or move for a continuance to complete the investigation of all claims and defenses and locate and interview witnesses. Although in only one of these allegations does he describe prejudice, from his argument, it is apparent that he regards the same prejudice as underlying all the allegations.

From interviews with the petitioner, who was the only witness at trial who was with the victim at her death, counsel was aware of his account of events. From the reports of Dr. Auble, which are clear, counsel was aware of her opinion on the issues of malingering and premeditation and the bases therefor. From the same reports as well as primary and other sources, counsel was aware of the petitioner's history and the petitioner's family history.

The transcript of the trial reflects that the theory of the defense, carefully articulated by counsel, was second-degree murder. Counsel recognized the seriousness of that offense and distinguished it from premeditated first-degree murder in not requiring premeditation. He distinguished the defense of insanity. He presented evidence that the petitioner suffered from a mental disease, which, at the time of the offense, was incompletely understood and untreated. He presented evidence of the difference in the petitioner after reevaluation and treatment. He observed the distinction between context and pretext, explanation and excuse.

During the guilty phase of the trial, Dr. Auble had several opportunities to state and explain her diagnosis and state and clarify her opinions on the issues of malingering and premeditation and the bases therefor.

The court then articulated, from the transcripts, various questions which had been asked of Dr. Auble by both trial counsel and the State with regard to the element of premeditation and the petitioner's state of mind at the time. The court then continues with its findings:

Although Dr. Auble now regards her testimony at the petitioner's trial as inadequate because counsel did not trace the petitioner's psychopathy in pre-offense events in his life, her failure promptly to alert counsel to her concerns suggests that she did not always so regard it. Nor was her testimony at the post-conviction hearing more specific than her testimony at the trial.

-19-

She did not add anything to her diagnoses, her opinions on the issues of malingering and premeditation, or the bases therefor.

It is true that counsel did not regard the petitioner's history as relevant on the issue of premeditation and did communicate that view to the Court during Dr. Auble's qualification hearing. Counsel's view of the issue, however, merely reflects Dr. Auble's report, which identifies objective measures as the bases for her opinion on the issues of malingering and the petitioner's history generally, not any specific event, as one of the several bases for her opinion on the issue of premeditation. From Dr. Auble's testimony, her diagnoses, opinions on the issues of malingering and premeditation, and bases therefor, including the objective measures and the petitioner's history, were clear. If, in one or more specific pre-offense events in the petitioner's life, there was another basis for her diagnoses or opinions, she had ample opportunity and experience as a witness to explain. Considering that the evidence of premeditation was, in the description of the Court of Criminal Appeals, ample, the Court finds no clear and convincing evidence that any deficiency in counsel's performance in this respect was prejudicial.

. . . .

The petitioner alleges that counsel did not meet with him enough [to] fully advise him of defenses and alternatives to trial. His testimony was that counsel and his staff did advise him of his options, but, probably because of age or inexperience, he did not understand them. He did not, however, specify the nature of his incomprehension, describe any attempt to alert counsel to its existence, or indicate its effect on his choices. The Court therefore finds neither deficiency or prejudice in counsel's performance in this respect.

Following review, we conclude that nothing in the record before us preponderates against the findings of the post-conviction court. The petitioner's arguments centers around the fact that Dr. Auble and Ms. Gothard would have conducted the defense at trial differently. However, trial counsel offered testimony, which the court obviously accredited, that he felt sufficiently prepared to present the defense challenging premeditation. Trial counsel specifically testified that he felt, based on discussions with and reading her report, that Dr. Auble was sufficiently prepared to testify at trial. Simply because Dr. Auble prefers to go through a step by step question and answer scenario to prepare for trial, that is not a requirement in order to prepare for trial. In fact, based on his experience, trial counsel testified that he found it to often be harmful. "[S]trategic and tactical decisions should be

made by defense counsel after consultation with the client . . . . Such decisions include what witnesses to call, whether and how to conduct cross-examination, . . . and what evidence should be introduced." *Pylant v. State*, 263 S.W.3d 854, 873-74 (Tenn. 2008).

Likewise, we cannot conclude that trial counsel was deficient for failing to conduct in depth discussion with the petitioner's prior attorneys, especially in light of the fact that he had their research and investigation materials. The main witnesses in the case, based upon the chosen defense theory, were Dr. Auble and the petitioner. Trial counsel clearly had discussions with these witnesses. Moreover, we find no fault with trial counsel's use of his office staff to assist in trial preparation. Trial counsel specifically testified that, while his staff did some of the preparatory work, he was aware of the fact that ultimately he was responsible for preparation of the case. According to his testimony, he considered that he was in fact so prepared, and nothing in the record contradicts that assertion.

Lastly, the petitioner's reliance upon trial counsel's billing claim to show a lack of preparation is misplaced. Trial counsel testified that he did not bill all the hours spent on this case, as he considered an appointed case, which he rarely took, to be an opportunity to provide a *pro bono* service. In short, the record before us establishes that trial counsel, faced with a horrible set of facts, including multiple contradicting confessions by the petitioner, provided his best efforts for the petitioner's defense based on adequate preparation. As such, the petitioner is entitled to no relief.

## 5. Failure to Review under the *Cronic* Standard

Next, the petitioner contends that the post-conviction court erred by failing to review the evidence presented under the standard set forth in *United States v. Cronic*, 466 U.S. 648 (1984). According to the petitioner, the post-conviction court should have taken steps to review the matter under *Cronic* because trial counsel "did not put the State to its burden when he failed to properly challenge the element of premeditation. To be sure, [trial counsel] failed to use the willing and eager Auble, a person with the credentials necessary to challenge the State's case of premeditation, properly and not at all in mitigation."

The *Cronic* case addressed claims of *per se* ineffectiveness and raised a presumption of prejudice which absolved the petitioner from the need to prove the *Strickland* elements of ineffective assistance of counsel. In *Cronic*, the United State Supreme Court identified three scenarios involving the right to counsel where the situation was "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id*. at 558-60. As noted in those instances, there is an irrebuttable presumption of prejudice, and the petitioner need not meet the *Strickland* analysis to prove the ineffective assistance of counsel. *Id*. at 662. The three enumerated situations are: (1) "the complete denial of counsel," where

the accused is denied the presence of counsel at a "critical stage;' (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) situations "where counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id*. at 659-60.

From our reading of the petitioner's brief argument on this issue, we conclude that he is asserting trial counsel entirely "failed to subject the prosecution's case to meaningful adversarial testing" based upon his failure to properly challenge the element of premeditation. We cannot agree that the evidence presented supports that argument. In *Bell v. Cone*, 535 U.S. 685 (2002), the Supreme Court addressed the issue of when to apply the rule of *Cronic*. In finding that the petitioner in that case was subject to the *Strickland* analysis, the Court explained:

> When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific point. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind.

*Bell*, 535 U.S. at 697. (citations omitted).

The situation in this case is quite similar. The petitioner's argument for application of the *Cronic* standard is based upon trial counsel's failure to properly challenge the element of premeditation. Thus, even petitioner fails to assert that trial counsel, "completely failed" to subject the prosecution's case to meaningful adversarial testing. Nothing in the record before indicates that the petitioner was denied representation at all phases of his trial. As such, it was not error for the post-conviction court to decide the merits of the petitioner's ineffective assistance of counsel claim applying the *Strickland* analysis, which has been addressed *supra*. The petitioner is entitled to no relief.

## 6. Addressing of All Issues Raises

Finally, the petition contends that the post-conviction court's written memorandum failed to address three of the issues raised in his post-conviction petition. Specifically, he contends that the court failed to address: (1) whether the trial court erred in failing to appoint

a second attorney; (2) whether trial counsel failed to file for a continuance and fully investigate all defenses and properly locate witnesses; and (3) whether trial counsel failed to properly challenge the admittance of the petitioner's statements to the police based upon the petitioner's mental history in a motion to suppress. The petitioner asserts that the post-conviction court "did not directly address the three issues."

The petitioner is correct that our post-conviction statute contemplates that the post-conviction court consider all issues raised by the proof. Tennessee Code Annotated section 40-30-111(b) states that:

> Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground.

Initially, we point out that we are somewhat perplexed by the petitioner's argument in this issue. Our review of the transcript indicates that the issue concerning the appointment of a second attorney was withdrawn by post-conviction counsel because he could find no legal authority to support the assertion. A court is not required to consider issues which counsel strikes.

With regard to issue two regarding the continuance, investigation of defenses, and locating witnesses, the court stated in the order:

> The petitioner alleges that counsel did not make a sufficient investigation of the facts, merely relying on information from his predecessor, Ms. Gothard, investigate his history or communication with Dr. Auble enough to challenge the charge of premeditation and present evidence of mitigating circumstances, discover his parents histories of mental instability, or *move for a continuance to complete to complete the investigation of all claims and defenses and locate and interview witnesses.*

Obviously, the court was aware of the issue raised. Although not directly addressed in the exact language again, it is clear from a reading of the order that this issue was decided by the court. Regardless, the petitioner, by his failure to present evidence at the hearing of other possible defenses or witnesses who might have been discovered has waived the issue. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

With regard to the petitioner's third allegedly omitted issue, the suppression of his

statement on mental health grounds, again, we can reach no conclusion other than that, the issue was decided by the court.  In it's order, the court directly stated:

> The petitioner alleges that counsel did not challenge the admissibility of his statements on mental-health grounds.  He did not, however, introduce proof on this issue.  In any event, the transcript of the suppression hearing reflects that the defense did rely on evidence of mental disease or disorder as one of the grounds for suppression.

A court is required only to address issues which are raised by the proof, which was not provided at the hearing according to the post-conviction court's order.  Nothing in the transcript before us preponderates against that finding.  Additionally, the post-conviction court found that trial counsel did in fact raise the contention in a motion to suppress.  As we do not have a copy of the motion to suppress or a transcript of any hearing on such motion, we are bound to accept the post-conviction court's assertion as correct.

**CONCLUSION**

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE